As an aside, Your Honor, it's a pleasure to be here on behalf of the Pro Hoc Vitae Council. I look forward to leaving the snow in Utah and came to the rain in Southern California. May it please the court. Your Honor, my name is Justin Heidemann, and as Pro Hoc Vitae Council, I have the opportunity of representing Travis Beauchesne, ICLIC Promotions LLC, and Playa Negra Enterprises as the appellant in this case. Counsel. The focus of the argument today, I think, can be summarized as a focus on the damage issue. I believe that the other issues are very well briefed, and although I'll touch on them momentarily, the damages issue is where this court should spend its time. Specifically, I believe that this court has the ability and should reverse the error committed by the district court with regard to both punitive damages and a determination as to the amount of damages. The standard in this case is high. The standard for both new trial as well as associated with that of AJNOV requires that this court determine that there is a substantive amount of evidence that is determined. My anticipation is that I will be reserving six minutes for rebuttal. Okay. Just watch your time. I will, Your Honor. Thank you. That having been said, I believe specifically that under the Lansd opinion, that this court has the ability to reverse the determination with regard to new trial underneath exception number three, as well as, and ironically in the Lansd opinion, it lists four exceptions, but then it has five different reasons, and so I would identify exception five as well. Specifically, I believe that there is no substantial evidence with regard to the inconsistent application of the terms of the agreement, and moreover, under five, I believe that there's simply no evidence whatsoever associated with consideration. Let me address the consideration first. The issue in this case, underneath this element, is whether or not any consideration was granted for the terms of the contract associated with the pre-existing clients. Ironically, we identify from Hetland's argument that he is entitled to receive all commissions associated with any clients that were previously being paid on by Stelia. That just simply makes no sense in light of the argument that in this particular instance, Mr. Hetland advances, which is that advanced media doesn't have to pay on any clients to Mr. Bouchain that he doesn't bring. And at the same time, he asserts that the terms of the deal are exactly the same across the board. So in other words, there's... And there's never any consideration given associated with these issues. No payment is made. In fact, the only thing that ever happens in this transaction is that the Weiss deal and the Bell Brothers deal are brought to the table. Ironically, there is a payment made for $15,000. Let me make sure that I understand what you're arguing. Are you agreeing that there was a partnership? No, Your Honor. We believe there's not a partnership. But I think in the alternative, particularly with regard to the punitive damages element and with regard to damages in general, if the court determines that there is a partnership, we have the ability to reject that quite handily. And quite frankly, I'm just simply taking... Reject what? I'm just taking it as a worst case scenario. If this court were to determine that there is an agreement, at most, with regard to damages, this court can only find that there is an entitlement to those clients that were brought in at the very most. And I apologize if there was confusion. Okay. But you do have a jury... We do. Finding here. We have a jury finding and this is the issue associated with that very high standard. But doesn't this come down to credibility and why wouldn't we defer to the jury on that issue? I think we're required to. I think Your Honor is correct in that regard. Although in this instance, there's nothing to defer to. There's no evidence. There's just simply nothing whatsoever. When the jury makes the determination as to what the damages should be, they simply take the full value that Stelia paid. But they fail to ever analyze and therefore there is no analysis upon which to defer as to whether or not that amount should be the proper amount of damages. Well, it's actually sort of a double deferral, isn't it? Because we're also deferring to the district court's assessment of what was before the jury. Absolutely, Your Honor. And quite frankly, that's where the lands opinion, I believe, comes into play because there are five specific enumerated exceptions in which this court... In fact, it's only those five circumstances where this court isn't required to defer. Ironically, the third standard is that there's a lack of substantive evidence, which of course is the whole point associated with the JNOV. And then of course the fifth one is that there's no evidence. And again, in this case, there simply is none. There's nothing by way of consideration that's presented by Hetland ever to support that the contract was formed or to support, and this is the crux of my argument, that he was entitled to payments associated with pre-existing customers. In other words, Stellia and Mr. Bouchang, as well as the other appellants, had had a longstanding relationship for which fees were being paid out. In fact, the record is quite clear that only 400,000 and change was ever paid as commissions associated with the two deals that were brought to the table by Mr. Hetland. And yet the damage award is such that my client should be entitled to... Or excuse me, all payments made during this period of time by Stellia. There's no consideration to create that deal. There's nothing to refer to or defer to. Moreover, along those lines, and this is where we go to this worst case scenario, the agreement is inconsistent because the only evidence that exists associated with pre-existing conditions is two statements. One, that all the deals are exactly the same. This is from Mr. Hetland. And two, that the deals are not exactly the same, specifically with regard to advanced media. And this is the point that we make with regard to the new trial. There cannot be a substantial amount of evidence for which this court should defer on the basis that there's an argument that the deal is the same, that both parties receive pre-existing conditions. When at the same time, the argument is that the deal is not the same. That the only person that should receive pre-existing clients and benefits therefrom is Mr. Hetland. If this court were to determine that the agreement was such that a partnership was formed and that it was a 50-50 deal, then this court must order a new trial at a minimum to determine the amount of money that would have been owed to my client from advanced media. In essence, a 50-50 deal for which no evidence was ever presented because it was never determined that there was an equal distribution on that business as well. And the offsets are substantial. We know that it's somewhere between $100,000 and $150,000 a month. It's so large that it could actually negate the entire award. Is your stronger argument the argument for judgment as a matter of law or for a new trial? And if they're not the same, how are they different? Well, ironically, Your Honor, there is an enormous amount of overlap because of the third exception under the Lansd opinion, specifically that there is an evaluation on the wrong standard, that of substantial evidence, which is the exact standard for J&OB. Personally, as an outside Utah attorney looking in, I think the stronger argument is for a new trial on the basis that there's simply no evidence on this topic in the record. Because there is no evidence, there is no ability for this court to defer. And in fact, that is the exact reason enumerated in Lansd for which a new trial should be granted. But if there's no evidence, aren't you entitled to judgment as a matter of law? Well, and that's the circular argument that I think Lansd is forced to deal with. Ironically, Your Honor, I found that exact language to be one of the problems in the case. It states it may be doubted, and this is on pinpoint site 1371, 1372. The case site is 833F 2nd. It may be doubted whether there is any verbal formula that will be of much use to trial courts. This entire paragraph enumerates that this is a conundrum that I believe all judges face. And in fact, they identify why this is a problem. It's thereafter that they enumerate the five issues. Excuse me, exceptions. I took from your briefs that your main argument on appeal is that the jury had insufficient evidence to support its verdict that Bousheyna hadn't formed a partnership because the trial testimony indicated that the terms of the alleged partnership were not definite. But I'm trying to figure out how we don't defer to the jury on all this. It seems like you're shifting the focus here from what your main argument was in the briefs. Thank you, Your Honor. It is true that the focus of my appellate argument is on the punitive damages. As I indicated at the outset, I believe that the arguments are very well stated in brief, and given the limited time I chose to deal with the one area that I think needed more focus, and that's the punitives. That is the main portion and thrust of our argument. The court's question, I think, is both a... I'm sorry. What's the main thrust and focus? I'm a little confused. What's the main thrust and focus of your argument? What you're arguing today? Today, I'm... Yes. Today, I'm... What you devoted most of your brief to. Yes, that's correct. All right. Thank you. You're at 5.51 if you want to reserve that time. Your Honor, I think I will. Thank you. Okay. Thank you. Your Honor, good morning, and may it please the court. My name is Eugene Rome, and I'm here for the plaintiff, Appellee Matthew Hedlund. Paying close attention to counsel's argument, it appears they all but concede the existence of a partnership, and for good reason. I think I need to speak up and as clearly as possible. Certainly. I apologize. Paying close attention to my colleague's argument, it appears that the defendants and appellants all but concede the existence of a partnership, and for good reason. The reason being is that there was extensive testimony, both from my client, as well as from a third party witness, a disinterested witness, who testified clearly, consistently, without fail, as to every single term of that partnership. Was that Mr. Tamponi? Yes, Your Honor. Mr. Tamponi clearly testified that a partnership existed, that Mr. Beauchene presented Matthew Hedlund as his partner, in connection with the referral of merchants, that they were all in on the deal, that they agreed to share profits and share losses, in connection with that partnership. Who was Tamponi, exactly? Mr. Tamponi is one of the principals of Stelia. So Stelia was the entity that was making the payments to Mr. Beauchene's entity. Mr. Tamponi testified about everything. Here's the interesting part. That was his contribution to the partnership, is that the theory? Whose? Beauchene, Stelia. So with my client, are we focusing on my client, Your Honor, what he contributed? No, I was asking about your adversary's contribution. My adversary contributed a pre-existing relationship, consisting of a single merchant, whose processing activity was very small at that time, before the partnership was formed. So it made sense that when my client contributed two huge merchants, the Weiss and the Bell brothers, it made sense to put them all together and split the proceeds on a 50-50 basis. And Stelia, I just want to make sure, because there are a lot of entities here, I want to make sure I've got it right. Stelia, wasn't that the company that Beauchene contributed? Your Honor, I understand your question. iClick is Mr. Beauchene's company. Stelia is merely a processor. In other words, my client and Mr. Beauchene needed a processor to be in place so they could refer the merchants to the processor. The processor would process their payment transactions and make payouts of referral fees to the partnership between my client and Mr. Heideman's client. And who found Stelia? Mr. Beauchene found Stelia. My client found Weiss and the Bell brothers, contributed them, went to their sites, met with them, collected the applications, stayed involved in the process, which is a very comprehensive process, as testified to by Mr. Tampone. In fact, my client kept trying to refer merchants, and that's also in the record, but Mr. Beauchene, for a very nefarious reason, told them that these merchants were not acceptable. The reason, at the time, my client took it at face value, but the real reason was Mr. Beauchene wanted to funnel them to a third entity so that my client would have even less transparency. Now, Mr. Heideman alluded to the punitive damages issue. Let's talk about that. It's a pretty high bar. You have to establish, at least the evidence needs to demonstrate that Mr. Beauchene acted with malice, with oppression, or with fraud. Where was the evidence of that? Mr. Beauchene lied. He lied to my client. He lied to Mr. Tampone. Mr. Beauchene told Mr. Tampone, I need a higher commission on these merchants because I'm splitting the fees with Mr. Hedlund, my partner. That was a lie to a third party. That I acknowledge. Mr. Beauchene lied to my client. At all times, and pardon my language, but he was using the word, they screwed us. They being Stelia. In other words, Stelia owed him a lot of money. My client saw that they owed him a lot of money. Here's how he saw it. There was a payments gateway. In other words, a computer software, a portal, where he could see the processing activity. Based on activity in excess of $1 million per month, he understood from the commission structure that they were entitled to considerable commissions, yet they were not paid. Mr. Beauchene repeatedly represented to my client that they had been screwed. That's the testimony. That's ballot. That's fraud. That is a misrepresentation. They were not screwed. In fact, Stelia was paying Mr. Beauchene all along. He was merely concealing those payments from my client, his partner. Now, there's further evidence of that. Evidence of over $1 million of fraud? I mean... Yes, there's evidence. Didn't they award him $1.4 million? Let me clarify that point. I think that also goes to Mr. Heidemann's argument about damages. Because the compensatory here was $740. I can explain that. Okay, go ahead. Okay. If the court looks at the record, the total amount paid out by Stelia, the third party processor, to Mr. Beauchene's company was $1.7 million. Now, half of that is $850,000. That's not what was awarded to my client. Rather, the amount that was awarded to my client was $740,000. And that was because the amount that was paid out to Mr. Beauchene by Stelia following the formation of the in his opinion on the JNOV motion. And the point here is that the jury did analyze damages. They didn't simply cut the full amount of $1.7 in half. To the contrary, they focused specifically on the date on which the partnership was formed, the commissions paid into the partnership by Stelia, and pursuant to the terms of the partnership of a 50-50 split, divided those in half, yielding $740,000 rather than the $850,000. So I submit respectfully, as found by the trial judge, that an analysis, and a very comprehensive analysis, was performed by the jury, and pursuant to the authority, it should be given deference. I thought you were going to say something about punitive. Of course. The question posed was as to the $1 million. That was the punitive over $1.4 million? Certainly, and I'll get to that. I was alluding to how the calculations were made. Now, here's what Mr. Beauchene told my client. His statement was they screwed us, they paid us only $30,000, and he sent a wire, I apologize, not a check. He sent a wire to my client for $15,000. That is fraud and malice. My client would have been none the wiser had Mr. Beauchene, for whatever reason, also elected to then subsequently file a lawsuit against Telia, at which point my client was deposed and asked about what he did with the money. My client was bewildered. How much was he supposed to get at that point? $740,000, which is the exact amount that the jury awarded. One half of $1.4 million. But he was telling them they got $30,000. I mean, they actually got $30,000, but he was telling them only $15,000. He acknowledged the partnership and sent them a wire for one half, $15,000. In other words, he acknowledged we're 50-50 partners. They screwed us, only paid us $30,000, so I will pay you, your share, the $15,000. So he cheated my client of $700,000. The actual amount that was paid was what? $15,000, Your Honor. No, no. He said there was $30,000. Was there more than that? Yes. $1.4 million, Your Honor. That was the $1.4 million? That's correct, Your Honor. And half of that would be? $700,000. So that was the compensatory damages? That's correct, Your Honor. $750,000. And for the punitives? The jury applied a two-times multiplier, which is perfectly appropriate under all the constitutional law principles. Did you ask for an amount? I believe we did. I believe we asked for a multiplier. I think it was higher. What did you ask for? I think I asked for $2.5 million or $2.5 million. $2.5 million. I asked for an amount that exceeded what was awarded, and I think I provided the jury with a range. And the district court, there was a motion to the district court that there be, was there a motion that there should not be an instruction on punitives? There was not, Your Honor. Was there a verdict motion? That's correct, that addressed the punitive damages, but there was no motion to strike punitives or eliminate him from the complaint. And the trial wasn't bifurcated? It was not, Your Honor. Compensatory and punitives. It was not bifurcated. Judge Carter decided to do it all in one fell swoop. Was there a request for bifurcation? I don't recall, Your Honor. I apologize. It was a couple of years ago. You'd recall if there had been, I assume. And it was denied. I don't believe a motion for bifurcation would have been made. I would have remembered opposing such a motion. If anything, there could have been an oral request, but I would be speculating, and I do not want to commit to that, Your Honor. I apologize. So going back to the issue of, since the focus was on damages, what I submit to the court is the following. That analysis was performed, and one of the items in the record is a spreadsheet. And the court will see that. And the spreadsheet does reflect a full payment of $1.7 million. But the amount post-dating the formation of the partnership was $1.4. And so the jury properly evaluated that spreadsheet, properly evaluated what payments were made after the partnership was formed, and properly allocated 50% of that to my client as compensatory damages. And given a fraud, basically in the amount of $700,000 plus, the punitive damages were warranted. The question of whether or not there was a  fraud, it did, Your Honor. Anything else? I think we understand your argument. I'd like to reserve the balance of the time for rebuttal. Rebuttal? Because you cross-appealed? No, to the extent... You don't get rebuttal. Very well. I apologize. We basically, at this point, we submit that it was very analytical. The verdict itself was a product of extensive analysis. And there's also ample evidence to support it, as noted by the trial judge. There was testimony by Mr. Hetland, Mr. Tampone. They testified credibly, consistently. The subsequent efforts to conflate unrelated issues, such as the advanced media issue, with the narrow question before the jury of whether or not a fraud exists, should not disrupt the verdict under well-reasoned authority. So, having said that, we respond. Thank you. Mr. Heideman? Thank you. Let me pick up where I left off. And I appreciate counsel for bringing up Mr. Tampone, because he is a key to this issue with regard to the fraud and the punitive damages. Mr. Tampone testified to two other very specific facts. One, that Mr. Bouchang granted Mr. Hetland full access. In fact, he instructed Stelia, Mr. Tampone's entity, that they should grant Mr. Hetland every access available. And in fact, Mr. Hetland testified that he had access. He actually sent emails to Stelia asking for explanations. And he complained in February of 2014, when his access was suddenly terminated, because as a result of that, it's impossible for there to be a misrepresentation in fraud. There is no possible way that a reasonable person could have relied on any of the alleged misrepresentations, which we disagree ever occurred. But no reasonable person could make that reliance when they had full access. They had that. And this court, I think, identifies the problem. And this is the issue with the numbers. Let me to Mr. Bouchang as a result of Weiss and the Bell Brothers. That's it. The argument from Hetland is that he should be entitled to the full value, even though there was no consideration granted or even addressed with regard to this prior relationship. Because Mr. Bouchang didn't just bring Stelia. He'd had a long-term relationship with Stelia. Did you argue this to the jury? Your Honor, I was not counseled, but it was argued to the jury. And I was argued to the jury. The problem with the 482 number is that 26 percent, and Mr. Tampone testified to this, that 26 percent was set aside as part of the set-off account. That means that a total of $356,794.01 was paid to Mr. Bouchang. Now here's the issue. At best, under their own terms, 50 percent is all they're I believe that there is substantial evidence to affirm a partnership, and that the terms are 50-50, then the most Mr. Hetland could ever claim is $178,397.01. And yet we're staring at over a million dollars in punitive damages for a man who had full access. Hence our request for a new trial, because there is not substantial evidence, nor is there any evidence to affirm this verdict. There's nothing that shows an entitlement to the pre-existing clients. There's nothing that shows any type of 50-50 relationship. And there's no evidence that if this court again, if this court says there was a partnership, why did my client not get his offsets from advanced media? And because there's no evidence on that, this court must reverse. This court has to look at it and say, I believe that it's against the weight of the evidence, the clear weight of evidence, and a new trial should be ordered. Because unfortunately, somehow this jury just went off the rails. And so did the judge. And so did the judge. And I don't mean that in a disrespectful fashion, but the numbers are the numbers. How do you come to a million dollars in attorney's fees when you're only entitled by your own argument to $178,397.01? The math doesn't work out. This is why we say there was no analysis failed on the part of the jury. Because when they were analyzing these numbers, for some reason, they forgot about the 50-50 split. For some reason, they forgot about what their own argument is, that they would be entitled to nothing beyond or nothing in the previous relationship. And ironically, Hetland makes that same argument. The record is replete. We quoted in brief multiple times. I can give the citations right now, where he says the deal is 50-50 for all the entities. And then when pressed on examination with regard to advanced media, Hetland specifically says, oh no, not that one. Boucher had to bring deals to the table. Well, this goes to the whole point that neither side disagrees that they wanted to memorialize this deal, that they wanted to write it down, that they sent multiple drafts back and forth. It never got signed. So when this court looks at whether or not a partnership actually existed, we have to be able to find out, A, was there sufficient terms that the parties would understand? And B, and this is the big one, consideration. What was ever offered? At most, I believe it's clear and plain, at most, that the best case scenario for Mr. Hetland is that somehow Weiss and Bell Brothers acted as that consideration, and therefore moving forward, at best, he's entitled to 50% of Weiss and Bell Brothers, 397-01, on its best day. That was your argument to the judge, and that was your argument to the jury, and that was the argument after the jury. And that's the only argument that the evidence will support. Is there any questions? No, thank you very much. Thank you for allowing me to appear, Pro Hoc Vitae. It's a pleasure to be in the great state of California. Thank you very much for being here, both of you. This argument is very helpful. The matter of Matthew Hetland versus Travis Bouchan is now submitted. Thank you.
judges: Schroeder, Murguia, Davis